**WESTPORT INSURANCE CORP.** Plaintiff

v.

**ATCHLEY, RUSSELL, WALDROP & HLAVINKA, L.L.P., et al.** Defendants

No. 5:01 CV 280.

United States District Court, E.D. Texas, Texarkana Division.

April 10, 2003.

George J. Manos, Jeffrey A. Goldwater, Michelle M. Bracke, Bollinger Ruberry & Garvey, Chicago, IL, Snow Eugene Bush, Jr., Snow E. Bush, Jr. PC, Longview, TX, Bryan G. Schumann, Terri M. Tegtman, Chicago, IL, for plaintiff.

A. Paul Miller, Miller James Miller & Hronsby, Texarkana, TX, for Atchley Russell Waldrop & Hlavinka, L.L.P., Charles J. Hlavinka, defendants.

Alice Oliver Parrott, Burrow & Parrott, Houston, TX, Philip Charles Brashier, McGlinchey & Stafford, Houston, TX, for Estate of Keaton, Patricia Keaton, defendants.

*AMENDED MEMORANDUM ORDER* [1]

FOLSOM, District Judge.

Plaintiff-insurer filed this declaratory judgment action against its insured, Defendant Atchley, Russell, Waldrop & Hlavinka, et. al. ("Atchley Russell"). Atchley Russell counterclaimed for declaratory judgment. Both parties seek a determination of their rights and obligations under a professional malpractice insurance contract. Now before the Court are the parties' cross motions for summary judgment on the duty to defend and the duty to indemnify (Dkt. Nos. 33 & 34). Also before the Court is Plaintiff's Motion to Strike the Affidavit of Don Morris (Dkt. No. 40). For the reasons stated herein, Plaintiff-insurer's Motion for Summary Judgment (Dkt. No. 34) is DENIED. Defendants' Motion for Summary Judgment (Dkt. No. 33) is GRANTED IN PART and DENIED IN PART. Also, Plaintiff's Motion to Strike (Dkt. No. 40) is DENIED AS MOOT.

## I.

### PROCEDURAL BACKGROUND

Originally, the Court scheduled a hearing for oral argument on the parties' summary judgment motions. But because this case was set as a bench trial, the Court also gave the parties notice that it would hear and consider evidence on any factual matters that might remain in dispute. At the hearing, Defendants presented live testimony from several witnesses. Plaintiff-insurer insisted that no factual disputes existed on the record and that the motions could be decided as a matter of law; there-

fore, the company chose not to present any evidence. Instead, it re-urged the Court to enter judgment as a matter of law. The insurer also objected to the taking of any testimony.[2]

After the hearing, the Court instructed the parties to submit additional briefing. Those briefs were to aid the Court in determining whether it could decide the indemnification issue, rather than only the duty to defend, before the conclusion of the underlying malpractice litigation in the state court. The Court directed the parties to address Texas law that appeared to restrain the Court from reaching the indemnification issue. The Court has reviewed the additional briefing and the applicable law. Now, the Court issues this Amended Memorandum Order on the parties' cross motions for summary judgment, both of which focus on interpreting "Exclusion B" under section XIV of the insurance contract.

## II.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Sreeram v. Louisiana State Univ. Med. Center-Shreveport,* 188 F.3d 314, 318 (5th Cir.1999)(citing *Anderson v. Liberty Lob-*

---

**1.** The Court vacates its Memorandum Order, dated March 27, 2003, which previously ruled on the parties' motions for summary judgment, and substitutes in its place this Amended Memorandum Order.

**2.** Because the Court does not rely upon any of the evidence submitted by the parties to make any of the rulings that follow, the Court will not take up the parties' objections to the same.

*by, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The district court should construe factual disputes "in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists." *See Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir.1998).

## III.

## DISCUSSION

### A. Duty to Defend

■ In Texas, the duty to defend is distinct and separate from the duty to indemnify. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185 (Tex.2002) (citing *Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997)). Also, the duty to defend is broader than the duty to indemnify. The first question Texas courts face is whether an insurer has a duty to defend the insured under the insurance policy. To make this determination, Texas courts apply a specialized analysis.

■ Generally, Texas state courts analyze whether the duty to defend arises by examining only two things: (1) the insurance contract; and (2) the claimant's petition in the underlying suit against the insured. As the Texas Supreme Court has stated: "An insurer's duty to defend is determined solely by the allegations in the pleadings and the language of the insurance policy." *King*, 85 S.W.3d at 187. Thus, Texas examines only the "eight corners" of the two documents—the pleadings in the suit filed by the claimant against the insured and the insurance contract between the insurer and the insured—to determine whether the duty to defend has been triggered. This approach is also called the "complaint allegation rule." Whether the insurer must defend the insured is determined as a matter of law

because the Court need only examine the policy language and the allegations in the underlying petition to make the decision. *See also Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997).

Texas's eight corners approach requires the Court to undertake two basic steps to decide whether the insurer must defend its insured in any given case. First, the Court must construe the contract. Second, it must examine the factual allegations made in the underlying suit and determine whether those allegations could possibly state a claim covered by the insured's policy. The Court now turns to examine the policy language.

### 1. Step One: Contract Construction

### a. General Rules of Construction

■ When interpreting an insurance contract, Texas law requires that the terms be construed against the insurer to avoid excluding coverage, so long as more than one reasonable interpretation exists. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Willis*, 296 F.3d 336, 339 (5th Cir. 2002). The insured's construction of the exclusionary clause must be adopted as long as that construction is not unreasonable. This is the case even if the insurer's proffered construction would be more reasonable. *Insurance Co. of North America v. Cash*, 475 S.W.2d 912 (Tex.1971). However, these preferences for adopting the insured's interpretation only apply where the contract language is ambiguous. *Mang v. Travelers Ins. Co.*, 412 S.W.2d 672, 674 (Tex.Civ.App.1967, writ ref'd). A contract is only ambiguous if it is susceptible to two or more reasonable interpretations. *See Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755 (Tex.1977). The Court interprets the contract so that every term is given effect, but it reads the terms in

the context of the whole contract, so that no provision is controlling. *Willis*, 296 F.3d at 339.

 An ambiguity, however, does not arise merely because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996); *Gen. Agents Ins. Co. v. Arredondo*, 52 S.W.3d 762, 766 (Tex.App.-San Antonio 2001, pet. denied). The contract is unambiguous if it can be given definite legal meaning. *Id.* Texas law indicates that whether an ambiguity exists is determined as a matter of law by "examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas*, 940 S.W.2d at 589. At bottom, the Court's goal in construing the contract is to give effect to the parties' intent. *Willis*, 296 F.3d at 339.

**b. Construing Exclusion B of the Contract**

██ The Court looks first to the policy, which is a "claims-made" policy. The relevant exclusion on which Plaintiff-insurer relies is XIV(B), which reads as follows:

This POLICY shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from:

B. any act, error, omission, circumstance ... occurring prior to the effective date of this POLICY if any INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission [or] circumstance ... might be the basis of a CLAIM.

The term "Claim" is defined as:

[A] demand made upon any INSURED for LOSS as defined in each of the attached COVERAGE UNITS, including, but not limited to, service of suit or institution of arbitration proceedings or admin. proceedings against any INSURED.

The term "Loss" is defined as "monetary and compensatory portion[s] of any judgment, award or settlement."[3]

The Court concludes that this language is unambiguous. The exclusion seeks to preclude coverage in two general situations, as follows: (1) when, before the policy period begins, the attorney has subjective knowledge that a claim will be made against him;[4] and (2) when the attorney is

---

3. Thus, reading the exclusion literally produces the following language:

This POLICY shall not apply to any [demand made upon any INSURED for [monetary and compensatory portion[s] of any judgment, award or settlement,] as defined in each of the attached COVERAGE UNITS, including, but not limited to, service of suit or institution of arbitration proceedings or admin. proceedings against any INSURED] based upon, arising out of, attributable to, or directly or indirectly resulting from:

B. any act, error, omission, circumstance ... occurring prior to the effective date of this POLICY if any INSURED at the effective date knew or could have reasonably foreseen that such act, error, omission [or] circumstance ... might be the basis of a [demand made upon any INSURED for

[monetary and compensatory portion[s] of any judgment, award or settlement,] as defined in each of the attached COVERAGE UNITS, including, but not limited to, service of suit or institution of arbitration proceedings or admin. proceedings against any INSURED].

4. *Coregis Ins. Co. v. Goldstein*, 32 F.Supp.2d 508, 513 (D.Conn.1998), is typical of the cases that recognize the subjective component of this exclusion. That case implied that if an attorney subjectively thought that her client had expressed an intent to sue her for malpractice before the policy period began, then reasonable minds could not differ about whether the attorney should have expected a claim; therefore, the exclusion, which was similar to the one in this case, denied coverage. To insure against this type of claim

engaged in willful blindness by ignoring the high probability that his actions will result in a claim being filed against him.[5] The following discussion explains how the exclusion's two prongs function, first standing alone, and then in tandem.

### (1) subjective component

The policy language excludes the following:

> any act, error, omission, circumstance ... occurring prior to the effective date of this POLICY if any INSURED at the effective date knew ∴.. that such act, error, omission [or] circumstance ... might be the basis of a CLAIM.

██ The policy's plain language shows that the first prong of Exclusion B applies in three situations. The common denominator in all of these is that the attorney must have had *subjective* knowledge that his client *intended to bring a claim* at a point in time prior to the beginning of the policy period. Thus, it does not matter whether any of the following occurred: (1) the attorney did not breach any duty; (2) the attorney did breach a duty but had no knowledge of the breach; or (3) the attorney knew that he had breached a duty. All that matters is that the attorney subjectively knew, prior to the policy period, that his client intended to bring a claim, whether the wrongs alleged were wholly imaginary, were based on a breach of which the attorney was unaware, or were based on breaches of which the attorney was aware. In these situations, the policy provides no coverage.

### (2) objective prong

As for the so called "objective prong," it, too, has a subjective component. This is because the exclusion must be read so as to ask the following question: What would any reasonable attorney expect, *given the facts of which the insured was actually aware?* The inquiry does not turn solely on the insured's subjective interpretation or understanding of the facts, but at a minimum, facts outside the attorney's knowledge should not be considered. *See Selko v. Home Ins. Co.*, 139 F.3d 146, 151 (3d Cir.1998) ("First, it must be shown that the insured subjectively knew certain

would not be to insure against a fortuity; rather, it would result in insuring against a certainty. *See, e.g., Scottsdale Ins. Co. v. Travis*, 68 S.W.3d 72 (Tex.App.-Dallas 2001, pet. denied).

**5.** This part of the exclusion has been called the objective prong, and courts vary in their approaches to it. Apparently, insurers added this type of language to their policies to avoid the difficulties associated with proving intent recision actions based on fraudulent inducement. Under Texas law, proving intent requires applying only a subjective standard to determine whether the insured made a misrepresentation that warrants rescinding the contract and excluding coverage. *See Ensearch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1496 (5th Cir.1992). On the one hand, the current policy language likely does avoid the sometimes onerous burden of proving the subjective (never constructive) intent element required to show fraud. On the other hand, the Court cannot construe the exclusion in a manner inconsistent with the parties' reasonable expectations of what is covered by a claims-made policy. *See, e.g., Logan v. Northwestern Nat'l Cas. Co.*, 144 Wis.2d 318, 424 N.W.2d 179, 186–7 (1988) (noting that, at least if strictly applied, a purely objective standard leads to no coverage at least in some situations that any attorney would expect to be covered, e.g. unrecognized simple negligence). But even satisfying the attorneys' reasonable expectations does not require the Court to apply a purely subjective standard. This exclusion prevents attorneys from engaging in willful blindness, i.e. it excludes claims where the attorney had constructive knowledge that a claim would be filed against him. The Court then must determine whether the circumstances surrounding the current lawsuit gave the insured constructive knowledge of an impending claim prior to the policy period.

facts."). Thus, the Court first must examine what facts the insured subjectively knew.

■ Second, once the Court has determined what facts the insured subjectively knew, the exclusion requires the Court to make an objective assessment of those facts. The question becomes whether a reasonable attorney, in possession of the facts that the insured possessed at the time he applied for insurance, would reasonably foresee *both* that a professional breach had occurred *and* that the breach would likely be the basis of a claim against the insured. If the objective calculus indicates that the attorney should have known that his conduct would result in a claim, the policy excludes coverage. *See Coregis Ins. Co. v. Goldstein*, 32 F.Supp.2d 508, 513 (D.Conn.1998).

Plaintiff-insurer takes a rather myopic view of this analysis. The insurer insists that the exclusion applies whenever a reasonable attorney, examining those facts known by the insured, would conclude that a professional duty, in fact, had been breached. The insurer's interpretation would exclude from coverage all possibly wrongful acts that occurred prior to the policy period, even if the attorney was not subjectively aware that his actions were in error and even though the attorney had no indication that his client intended to file a claim against him. Thus, so long as the attorney was conscious, the insurer's approach would exclude coverage for any error that occurred prior to the beginning of the policy period, which period is invariably for only one year. This is because the "reasonable attorney" would recognize most, if not all, instances in which any duty had been breached, even if many attorneys would not be aware that a breach had occurred. Indeed, the whole question of whether a duty was breached is an objective one, too. In this fashion, the insurer

argues that determining the sole issue of whether a breach did actually occur substitutes for deciding whether the attorney should have known a claim would be filed because of the breach.

■ The Court is mindful that this policy is a "claims-made" policy that is reissued in increments of only one year. In claims-made policies, the insurer must cover only those claims that are actually made against the insured during the policy period. Consequently, the date of the occurrence of the wrongful act on which the claim is said to be based matters less than the date on which the claimant actually makes a claim against the insured for the allegedly wrongful conduct. Thus, the date on which the claim is made against the insured, rather than the date of the allegedly wrongful act, governs whether the policy may provide coverage.

The insurer's interpretation of Exclusion B, however, effectively bars all occurrences, except possibly wholly frivolous or groundless claims, that took place before the policy period, even if the claim based on that occurrence is filed during the policy period. This is because the exclusion's objective standard, at least as articulated by the insurer, would be precisely the same standard that will be applied in the underlying malpractice suit to determine whether the attorney actually committed malpractice. If the court hearing the malpractice action determines a breach occurred, then the insurer believes that the objective prong of the exclusion would preclude coverage. Oddly enough, if the objective standard governing whether a breach occurred (as applied in the malpractice suit) indicates that no breach took place, then the policy's exclusion would not be triggered because the attorneys "should not have known" about a claim not based on an actual breach of duty. Thus, the provision does not exclude frivolous claims,

but instead, as interpreted by the insurer, it excludes only successful malpractice claims.

At best, the insurer's interpretation seems odd, given that this is a malpractice policy, ostensibly meant to cover claims of malpractice. At worst, it looks like an attempt to avoid coverage for any viable malpractice claim that *occurred* before the policy period, even if it is timely *claimed.* In effect, as construed by the carrier, the occurrence *and* the claim would have to take place during the twelve month policy period for there to be coverage. This construction offers the insured little to no coverage in return for the insured's not insignificant premiums. That the policy period invariably lasts only twelve months underscores this observation. *See generally* BALLENTINE & TAMBORELLO, PLLF FL–CLE 6–1 (Main Handbook) *Professional Liability of Lawyers in Florida* § 6.9 (2002) (noting absence of worth of "occurrence /claims-made combination" policies). In light of the policy's short, twelve-month term, and considering the nature of claims-made policies generally, the parties could not have intended the exclusion to be read so broadly.

Generally, the Court agrees that "a breach of a professional duty and a basis for a claim are thus 'two peas in a pod.'" *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.,* 264 F.3d 302, 307 n. 3 (3d Cir.2001). However, while an actual breach of duty is a prerequisite to invoking the objective prong of the exclusion, a breach alone is not always sufficient. The Court must consider other factors. For example, at least two considerations play a role in determining whether an attorney should have known that his actions would lead to a claim being filed against him: (1) whether the client intends *not* to bring the claim, as might be evidenced by a lapse of time between the end of representation and the filing of a malpractice suit; and (2) the client's expression of satisfaction or dissatisfaction or the like. *See, e.g., Coregis v. McCollum,* 1997 WL 128132, No. 96–1068–CIV–T–17B (M.D.Fla. March 6, 1997) (attorney knew claim would be filed, as evidenced by memo); *Coregis Ins. Co. v. Goldstein,* 32 F.Supp.2d 508, 513 (D.Conn. 1998) (a fact question was presented where the client's dissatisfaction did not necessarily mean that he would bring suit and a five month delay existed between filing suit and the end of the representation). Without considering these and other relevant factors, a reasonable attorney could not properly determine whether the insured should have known a claim was coming. *See id.* ("[T]he Court declines to follow [ ]decisions [that interpret similar exclusions more broadly] because the Court does not find their reasoning persuasive, but instead, believes they give too expansive of a reading to the exclusion provisions of the contracts they interpret.").

Importantly, some breaches of one's professional duties are so glaring that the breach itself trumps any other factors. For example, where an attorney fails to prosecute a client's lawsuit for approximately twelve years and where that failure results in dismissal of the clients suit, there can be no real question that he should expect a claim. *See, e.g., Mt. Airy Ins. Co. v. Thomas,* 954 F.Supp. 1073, 1080 (W.D.Pa.1997). In these brighter line situations, the inquiry focuses on the following: (1) was the breach caused by reckless or intentional conduct; and (2) what degree of harm would obviously occur as a result of the blatant breach? The Court believes these considerations are what drive many other court opinions interpreting this or similar exclusions. Thus, while some courts give too expansive a reading to the exclusion, they may very well reach the right result because of the presence of

a clear indication that an attorney should expect a claim for his rather exceptional breach of duty, regardless of any other factors. *See Goldstein,* 32 F.Supp.2d at 513 (concluding that *Mt. Airy*'s interpretation of the exclusion was too broad, and noting that in other cases, much clearer indications that the client would file a claim existed to preclude coverage).

■ Following the reasoning outlined above, the Court concludes that the exclusion's "objective" language denies coverage in two additional situations. In the first instance, coverage does not exist where an insured has knowledge of facts that would indicate to a reasonable attorney that a glaring or blatant breach had occurred. Whether the client has expressed dissatisfaction to the attorney or whether the attorney subjectively believes the client might file a claim is of no importance. The severity of the breach, gauged by its deviation from professional standards and the degree of harm it causes, provides the insured with constructive knowledge of an impending claim. All reasonable attorneys would expect a claim to result from such a breach of professional duty.

In the second instance, the exclusion denies coverage where the following two conditions are met. The insured must be aware of facts that would lead a reasonable attorney to conclude that at least some breach of professional duty, even if minor, likely did occur. But the insured must *also* have some indication that his client is dissatisfied enough to suggest that the client likely will file a claim against him. Thus, in the second instance, the policy excludes coverage where the lawyer knows his client is dissatisfied and where it appears that some breach, though slight, did occur. *See, e.g., Goldstein,* 32 F.Supp.2d at 513 (D.Conn.1998) (even where the client gave some indication of dissatisfaction, a fact question still remained as to

whether the insured should have foreseen a malpractice claim being filed).

■ In sum, Exclusion B denies coverage in three situations, as follows: (1) when the insured has subjective knowledge of an impending claim; (2) when facts subjectively known to the insured would lead a reasonable attorney to conclude that a grossly flagrant or glaring breach of duty occurred; or (3) where facts subjectively known to the insured would lead a reasonable attorney to conclude that at least some breach of duty occurred *and* where those same facts also indicate that the client is dissatisfied to a point that would lead a reasonable attorney to conclude that the client likely would file a claim. Having construed the exclusion language, the Court now turns to examine whether any facts trigger the exclusion to deny coverage.

### 2. Step Two: Considering the Underlying Petition's Factual Allegations

Before the Court can apply the construed exclusion language to the facts, it must determine against what set of facts the exclusion language should be read. Texas follows the "eight corners rule." *King v. Dallas Fire Ins. Co.,* 85 S.W.3d 185, 187 (Tex.2002). Generally, this rule requires the Court to consider only those facts that the claimant has alleged in the underlying malpractice suit against the insured.

However, in this case, the parties submitted extensive stipulations about various facts. These facts do not necessarily originate from the claimant's petition filed against the insured in the state court. In some instances, these stipulations, while not necessarily inconsistent with the claimant's state court petition, go well beyond the claimant's allegations in terms of factual specificity. Therefore, the Court must determine whether it should, or indeed

whether it may, consider the stipulations of fact proffered by the insured and the insurer in this coverage dispute. The Court looks to state law for the answer.

### a. Whether Extrinsic Evidence May Be Considered in Determining the Duty to Defend?

### (1) Texas Supreme Court Authority

As stated in *King,* the Texas Supreme Court does not appear to recognize any exceptions to the strict eight corners rule. *See King,* 85 S.W.3d at 187. The Texas high court specifically noted that the duty to defend inquiry looked "solely" to the pleadings and the claimant's allegations in the underlying action against the insured. Furthermore, the Court resolves all doubts about coverage in favor of the insured. *See id; Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.,* 387 S.W.2d 22, 26 (Tex.1965) (doubt resolved in favor of coverage); *see also Rhodes v. Chicago Ins. Co.,* 719 F.2d 116, 119 (5th Cir.1983) (applying Texas state law, citing *Heyden*); *Nutmeg Ins. Co. v. Clear Lake City Water Authority,* 229 F.Supp.2d 668 (S.D.Tex. 2002) (same). Therefore, if the allegations in the underlying pleadings could even potentially trigger coverage, and the allegations do not on their face conclusively activate an exclusion, then the insurer must defend its insured against the claim. *See King,* 85 S.W.3d at 187 ("The court should not imagine factual scenarios that might trigger coverage or read facts into the pleadings."); *see also Argonaut Southwest Ins. Co. v. Maupin,* 500 S.W.2d 633, 635 (Tex.1973) (duty triggered if pleadings raise a potential for coverage).

▇▇▇▇▇ Additionally, the insured has the initial burden of demonstrating that the claims against it in the underlying lawsuit are potentially covered by its contract for insurance. *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 99 F.3d 695, 701 (5th Cir.1996); *Am. Equity Ins. Co. v. Castlemane Farms, Inc.,* 220 F.Supp.2d 809 (S.D.Tex.2002). However, the insurer bears the burden of proving the applicability of any exclusions or limitations to coverage. *See Canutillo,* 99 F.3d at 701 (citing TEX. INS. CODE art. 21.58(b)). Here, only the applicability of the exclusion is in dispute.

Significantly, the Texas Supreme Court's straightforward recitation of the eight corners rule—as it relates to considering extrinsic evidence to decide coverage and whether the insurer must defend the insured—does not wholly square with the practice of the lower state courts, or even the high court's own analysis. For example, while *King* uses strong language to embrace the eight corners rule, its own analysis demonstrates that the courts may examine at least some types of extrinsic evidence alongside the allegations in the underlying lawsuit.

*King*'s analysis makes this point evident, as follows: *King* evaluated an exclusion clause, which contained a subjective element, and the Court distinguished it from an exclusion clause in *Fidelity & Guaranty Ins. Underwriters, Inc. v. McManus,* 633 S.W.2d 787 (Tex.1982). Admittedly, the *King* court did not directly address whether the trial court should have examined extrinsic evidence to determine whether the insurer's duty to defend had been triggered. However, in distinguishing the case then at hand from *McManus,* the court made the following observation. In *McManus,* "a readily determined fact" controlled whether the exclusion applied, and thus, whether coverage existed. *See King,* 85 S.W.3d at 189.[6]

6. The concurrence in *State Farm Fire & Casu-* alty Co. v. Wade, notes that *McManus* stands

While the *King* opinion clearly focused on an issue other than whether extrinsic evidence should be examined, the court's own analysis concedes that the Court may examine at least some facts derived from sources extrinsic to the policy and the claimant's petition when addressing an insurer's duty to defend.

Critically, *King* fails to illuminate how narrow or broad this exception cuts into the otherwise strict ban on extrinsic evidence imposed by the eight corners rule. The parties have not presented, nor has the Court found, any other Texas Supreme Court authority that is dispositive of this issue. Therefore, in addition to the general trend of Texas Supreme Court jurisprudence,[7] the Court looks also to lower state court rulings to determine what extrinsic evidence should be evaluated in deciding whether the insurer must defend its insured against the underlying claim. *See Lawrence v. Virginia Ins. Reciprocal*, 979 F.2d 1053, 1055 (5th Cir.1992). These lower state cases, taken together with the general pronouncements and rationale applied by the Texas Supreme Court will

---

, for the following proposition: "If the petition only alleges facts excluded by the policy, then the insurer is not required to defend." 827 S.W.2d 448 (Tex.App.—Corpus Christi 1992, writ denied) (citing *McManus*, 633 S.W.2d at 788). The concurrence recognizes that the pleadings can resolve the duty to defend, if they reveal facts that, even taken as true, defeat coverage. However, this is different than saying that an insurer need only defend an insured if coverage applies. The latter proposition depends on applying the former; in short, the rules for determining what evidence may be considered when assessing whether an insurer owes a defense may be determinative of whether the insurer must defend its insured because extrinsic facts (which might prove no coverage) are generally not considered in the analysis. Thus, if the claimant's pleadings are silent on certain facts that might defeat coverage, the duty to defend is triggered, though coverage may ultimately not exist. However, those extrinsic facts only come into play when considering the duty to indemnify, which is a separate and distinct inquiry. *See King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185 (Tex.2002) (duty to indemnify is a separate inquiry than the duty to defend, and it looks to the actual facts, rather than to the allegations in the claimant's petition).

7. One commentator has characterized the Texas Supreme Court's approach to the issue of whether or not extrinsic evidence can be examined under a duty to defend analysis as follows:

> In recent years, the Texas Supreme Court has taken a firm position that no extrinsic evidence is permitted in considering the duty to defend. In doing so, the court has not specifically declined to follow earlier precedent where consideration of extrinsic evidence was permitted and has not necessarily distinguished those cases; instead it has simply repeated the mantra of the "eight corners" rule.

Michael Orlando and Megan Gabel, *The Duty to Defend: What a Difference a State Makes!*, 29-SUM Brief 14, *16 (2000)(citing *Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex.1997); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997)). The commentary goes on to note that even after strong pronouncements that the high court would not look outside the pleadings to decide an insurer's duty to defend, some lower courts still look at extrinsic evidence in certain situations. *See id.* (citing *Merchants* and *Tri–Coastal Contractors, Inc. v. Hartford Underwriters Ins. Co.*, 981 S.W.2d 861, 863 (Tex.App.-Houston [1st Dist] 1998, pet. denied)).

Other commentators have made similar observations. *See also* Ellen S. Pryor, *Mapping the Changing Boundaries of the Duty to Defend in Texas*, 31 TEX. TECH. L. REV. 869, 890 (2000) "Texas courts consistently recite a strict eight-corners rule. In addition, the Texas Supreme Court has never issued an opinion that clearly endorses an exception to that approach .... Lower courts and federal courts, however, have modified the strict eight-corners rule for some types of extrinsic evidence." *Id.* (citing *Ohio Cas. Ins. Co. v. Cooper Mach. Corp.*, 817 F.Supp. 45, 48 (N.D.Tex.1993) and *State Farm Fire and Cas. Ins. Co. v. Wade*, 827 S.W.2d 448, 453 (Tex.App.-Corpus Christi 1992, writ denied)).

help the Court to predict how the Texas high court would resolve the issue. *See Centennial Ins. Co. v. Ryder Truck Rental, Inc.*, 149 F.3d 378, 382 (5th Cir.1998) (Heartfield, J., sitting by designation).

### (2) Texas Intermediate Appellate Guidance

Unfortunately, Texas intermediate courts of appeal do not agree on the breadth of extrinsic evidence that can be properly interjected into the duty to defend analysis. Add to that the many federal district courts and Fifth Circuit opinions relying on these disparate state cases, and one faces a cacophonous set of rulings indeed.[8] However, the federal cases each rely on possibly outdated circuit opinions or on state appellate opinions that are at either end of the schism that now divides the Texas state courts.[9]

For example, in *Ohio Casualty Insurance Company v. Cooper Machinery Corporation*, 817 F.Supp. 45, 48 (N.D.Tex. 1993), Judge McBryde addressed the issue of whether to examine extrinsic evidence to determine whether coverage existed. He determined that the underlying claim against the insured showed, on its face, that no coverage existed under the policy. Therefore, the insurer had no duty to defend. Even so, he also made the following comments:

> However, even if there were allegations of facts that would indicate the existence of coverage, the insurance company would be entitled in the declaratory judgment action to establish that the facts are false and that, therefore, there is no obligation under the policy, either to defend or to pay. *See McLaren v. Imperial Casualty & Indemnity Co.*, 767 F.Supp. 1364, 1372–75, (N.D.Tex. 1991), *aff'd*, 968 F.2d 17 (5th Cir.1992), *cert. denied*, 507 U.S. 915, 113 S.Ct. 1269, 122 L.Ed.2d 665 (1993); *Blue Ridge Ins. Co. v. Hanover Ins. Co.*, 748 F.Supp. 470, 473 (N.D.Tex.1990). Here, the true facts are that there is no coverage, with the consequence that plaintiff has no duty to defend and no duty to pay.

*Id.* Thus, based on the Fifth Circuit's holdings in *McLaren* and in *Blue Ridge*, the district court concluded that, even in the context of deciding the insurer's duty to defend, the courts could always examine extrinsic facts to determine coverage *and* to contradict the allegations made in the claimant's underlying petition against the insured.

---

**8.** It has been observed that the federal courts tend to apply a more liberal approach to examining extrinsic evidence in evaluating the duty to defend than do the Texas state courts, *see Orlando and Gabel, supra* at * 16. This is so even though the federal courts are purportedly applying Texas law. *See, e.g., Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 194 (5th Cir.1998) (Texas law) (*citing Gonzales v. American States Ins. Co.*, 628 S.W.2d 184, 187 (Tex.App.—Corpus Christi 1982, no writ) *and Acceptance Ins. Co. v. Hood*, 895 F.Supp. 131, 134 n. 1 (E.D.Tex. 1995) (Schell, J.)) (citing *State Farm Fire & Casualty Co. v. Wade*, 827 S.W.2d 448, 452–53 (Tex.App.—Corpus Christi 1992, writ denied)).

**9.** *Cf. Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 194 (5th Cir.1998) (*citing Gonzales v. American States Ins. Co.*, 628 S.W.2d 184, 187 (Tex.App.—Corpus Christi 1982, no writ) *and Acceptance Ins. Co. v. Hood*, 895 F.Supp. 131, 134 n. 1 (E.D.Tex.1995) (Schell, J.) (citing *State Farm Fire & Casualty Co. v. Wade*, 827 S.W.2d 448, 452–53 (Tex.App.— Corpus Christi 1992, writ denied)) *with Tri-Coastal Contractors, Inc. v. Hartford Underwriters Ins. Co.*, 981 S.W.2d 861, 863 (Tex. App.-Houston [1st Dist] 1998, pet. denied) (noting no Texas cases actually apply *Wade* ) *and City of Dallas v. Csaszar*, No. 05–99–00208–CV, *3 (Tex.App.-Dallas 1999, pet. denied) (noting no Texas Supreme Court has adopted the *Wade* or *Gonzales* exceptions), *available at* 1999 WL 1268076.

More recent Texas intermediate court holdings seriously undermine such a broad statement. It is true, as the discussion below reveals, that all state courts would consider it proper to examine extrinsic evidence of fundamental coverage facts, such as whether the party bringing the claim is a named insured under the policy. This is in line with the holding in *Blue Ridge*. *Cf. Tri–Coastal Contractors, Inc. v. Hartford Underwriters Ins.*, 981 S.W.2d 861 (Tex. App.-Houston [1st Dist.] 1998, pet. denied) *with Blue Ridge Ins. Co. v. Hanover Ins. Co.*, 748 F.Supp. 470, 473 (N.D.Tex.1990). And while *McLaren* presents a thoughtful analysis of several, older Texas Supreme Court cases, its narrow construction of the complaint allegation rule goes against more recent state law opinions. *See, e.g., Tri–Coastal Contractors, Inc.*, 981 S.W.2d 861.

Moreover, in other cases, the Fifth Circuit has not been so keen to ignore the stricter version of Texas' complaint allegation rule. *See, e.g., Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 394 (5th Cir.1995). In refusing to examine extrinsic evidence to defeat coverage for the duty to defend, the *Lafarge* court noted that "the complaint is simply not as ambiguous as the [the insurer] would have us believe." *Id.* The insurer had cited *McLaren, Western Heritage, Wade, Boll,* and *Gonzales* [10] for the proposition that it could submit, and that the court should consider, extrinsic evidence that showed the absence of coverage in the context of the duty to defend. The court noted that these cases were "inapposite; they involve situations in which the complaint either

omitted or indisputably misrepresented material facts that would have clearly excluded coverage." *Id.* at n. 8. Thus, contrary to Judge McBryde's assertion, the Fifth Circuit does not appear to believe that Texas law would allow the wholesale admission of extrinsic evidence for the purpose of defeating coverage; at best, some narrower exception applies. ·

More recently, even the Texas Supreme Court has used stronger and stricter language in applying the eight corners rule than *McLaren* perceived. *See, e.g., King,* 85 S.W.3d at 187. Thus, it appears that *McLaren* went too far when it limited the application of Texas' complaint allegation rule and by limiting its bar on extrinsic evidence. And even if *McLaren* correctly restated Texas state law as it existed at the time that case was decided, that court did not have to contend with more recent state opinions that would not agree with emasculating the eight corners rule.

Instead of relying exclusively on older circuit opinions, the Court looks to recent trends in the jurisprudence of the Texas Supreme Court and Texas' lower courts for guidance in making this *Erie* guess. After all, Texas state courts are better positioned than this Court to understand and balance the competing policy issues in contracts for insurance, which are both interpreted by state law and subject to the state's regulatory schemes. *See Omaha Property and Cas. Co. v. Johnson,* 923 F.2d 446, 448 (6th Cir.1991) ("The states regulate insurance companies for the protection of their residents, and state courts are best situated to identify and enforce the public policies that form the foundation

---

10. *See id.* citing, *McLaren v. Imperial Casualty & Indemnity Co.,* 767 F.Supp. 1364, 1372–75, (N.D.Tex.1991), *aff'd,* 968 F.2d 17 (5th Cir. 1992), *cert. denied,* 507 U.S. 915, 113 S.Ct. 1269, 122 L.Ed.2d 665 (1993); *Western Heritage Ins. Co. v. River Entertainment,* 998 F.2d 311, 313 (5th Cir.1993);*State Farm Fire &* *Casualty Co. v. Wade,* 827 S.W.2d 448 (Tex. App.—Corpus Christi 1992, writ denied); *Int'l Svc. Ins. Co. v. Boll,* 392 S.W.2d 158 (Tex.Civ. App.-Houston [1st Dist.] 1965, writ ref'd n.r.e.); *Gonzales v. Am. States Ins. Co.,* 628 S.W.2d 184, 186 (Tex.App.-Corpus Christi 1982, no writ).

of such regulation."). This Court will not presume that the Texas Supreme Court approves of the federal interpretation of Texas law on this issue, especially where federal interpretations appear to be based on a minority of less recent, intermediate state court opinions.[11] Therefore, the Court turns now to examine how the Texas state intermediate appellate courts handle extrinsic evidence, if at all, in deciding whether an insurer bears the duty to defend. *See Centennial Ins. Co.,* 149 F.3d at 382.

### (a) *Wade*'s Exception to the Eight Corners Approach

Only one line of Texas cases purports to apply a broad exception to the complaint allegation rule. These culminate in *State Farm Fire & Casualty Co. v. Wade,* 827 S.W.2d 448, 452–53 (Tex.App.—Corpus Christi 1992, writ denied), which appears to be the most recent case in which the rule is actually applied, rather than merely cited. The majority in *Wade* held that an exception to the complaint allegation rule allows the courts to examine extrinsic evi-

dence when deciding an insurer's duty to defend. A closer look at the breadth of this exception is in order.

In *Wade,* the insurer brought a declaratory judgment action to determine whether an exclusion applied that would defeat coverage. The insurance policy there covered boat accidents that resulted from specific uses of the boat. The court recognized that, usually, it was constrained to view only the allegations in the claimant's pleadings and the insurance policy to decide the duty to defend. However, the court also noted: "The problem here is that by reading the underlying petition broadly, in favor of the insured, it is impossible to know how the boat covered by the policy was used when it left the [the dock]." *Id.* at 451. Thus, the eight corners rule frustrated the court's inquiry into critical coverage facts.

Nevertheless, instead of resolving these facts, which had not been alleged in the claimant's petition, in the insured's favor to find coverage, *see, e.g., Heyden Newport Chemical,* 387 S.W.2d at 24, the court said:

---

11. *See, e.g. John Deere Ins. Co. v. Truckin' U.S.A.,* 122 F.3d 270 (5th Cir.1997); *Western Heritage Ins. Co. v. River Entertainment,* 998 F.2d 311, 313 (5th Cir.1993) (citing only *Wade* as authority for examining extrinsic evidence). *John Deere* cited only *Wade* and *Cook v. Ohio Casualty Ins. Co.,* 418 S.W.2d 712 (Tex.Civ.App.Texarkana 1967, no writ) for the proposition that the district court did not commit error by evaluating extrinsic evidence in deciding the duty to defend. Notably, *Cook* examined extrinsic evidence only *after* the underlying litigation between the claimant and the insured had terminated. In deciding *John Deere,* the circuit did not have the benefit of more recent cases, which are discussed below, in making its decision. Thus, the circuit did not confront the view held by some state appellate courts that *Wade* stands alone. *See, e.g., City of Dallas v. Csaszar,* No. 05–99–00208–CV, n. 2 (Tex.App.-Dallas 1999, pet. denied) (no publication), *available at* 1999 WL 1268076. Nor did the circuit apply an

*Erie* analysis to determine how the Texas Supreme Court would resolve the inconsistent approaches in the lower state courts. Instead, the *John Deere* court cites only *Wade* and *Cook* for what it apparently took as an undisputed proposition of state law. Apparently, the fact that the Texas Supreme Court has never adopted *Wade* and that the high court continues to use "strict eight corners" language was not made an issue in those cases. The parties have not cited, nor has the Court found, any Texas Supreme Court cases that suggest that extrinsic evidence always must be considered in deciding the duty to defend, rather than simply resolving coverage in favor of the insured where certain facts are absent from the claimant's petition. Indeed, in light of the more recent appellate state cases, a more thorough analysis is due than the string cite proffered in *John Deere.* The Court hopes to provide that in its discussion here.

[t]he insurer is not foreclosed from litigating the application of an exclusion by using evidence and facts outside the pleadings in the underlying wrongful death suit.... It makes no sense to us, in light of these holdings, to say that extrinsic evidence should not be admitted to show that an instrumentality (boat) was being used for a purpose explicitly excluded from coverage, particularly when doing so does not question the truth or falsity of any facts alleged in the underlying petition filed against the insured.

*Id.* at 451, 453. Thus, the court concluded that even in deciding the duty to defend, it could examine and weigh extrinsic evidence relevant to coverage, so long as those extrinsic facts did not overlap or contradict the factual issues that would be determined in the underlying lawsuit between the claimant and the insured.

Significantly, *Wade* relied on three intermediate court cases. In each of these cases, *Int'l Svc. Ins. Co. v. Boll,* 392 S.W.2d 158 (Tex.Civ.App.-Houston [1st Dist.] 1965, writ ref'd n.r.e.), *Cook v. Ohio Casualty Ins. Co.,* 418 S.W.2d 712 (Tex.Civ.App.Texarkana 1967, no writ), and *Gonzales v. Am. States Ins. Co.,* 628 S.W.2d 184, 186 (Tex.App.-Corpus Christi 1982, no writ), the courts faced the question of whether they could examine extrinsic evidence relevant to coverage. Each case depends on the previous one for its analysis and holding, as each descends from *Boll,* then *Cook* and *Gonzales,* finally resulting in *Wade.* This is the only line of state cases that the Court has found that applies a broad exception to the eight corners rule under Texas law.

In *Boll,* the insurance policy excluded coverage for accidents involving a certain named person. The underlying petition did not allege that the accident was caused by the named person so excluded; rather, the claimant's petition merely identified the driver as the "son" of the policy holder. *After* the conclusion of the underlying suit, the parties stipulated that the policy holder's only son was the same as the named person excluded from coverage. Thus, the court considered extrinsic evidence of the identity of the son, by stipulation, to conclude that no coverage existed and that no duty to defend or indemnify arose. But it did so only after the underlying suit terminated.

In *Cook,* the court examined *Boll* and *Heyden. See Cook,* 418 S.W.2d at 715–16. The state court of appeals concluded that the Texas Supreme Court would make a distinction between allowing the examination of extrinsic evidence that went to the merits of the underlying claim and evidence that went only to coverage facts under the policy. While the *Cook* court recognized that the "character of writ action in *Boll* deprives it of value of precedent," the court nonetheless concluded that *Boll* illuminated a distinction between extrinsic evidence that went only to coverage facts and extrinsic evidence that touched on the merits of the underlying claim against the insured. Also, the court noted that the facts then before it were almost identical to those in *Boll.* Therefore, the court did examine extrinsic evidence.

*Gonzales* cites and discusses both *Boll* and *Cook.* Based on *Boll* and *Cook,* and the distinctions those cases draw between "merits facts" and "coverage facts," the *Gonzales* court was able to discern the following rule:

Where the insurance company refuses to defend its insured on the ground that the insured is not liable to the claimant, the allegations in the claimant's petition control, and facts extrinsic to those alleged in the petition may not be used to controvert those allegations. But,

where the basis for the refusal to defend is that the events giving rise to the suit are outside the coverage of the insurance policy, facts extrinsic to the claimant's petition may be used to determine whether the duty to defend exists. *Gonzales*, 628 S.W.2d at 187. Thus, the *Gonzales* court would not examine any extrinsic evidence that tended to contradict an allegation made in the petition, though it would have examined "coverage only" facts.[12] And in fact, the court looked only to the petition's allegations to reach its decision. The Court did not reach any extrinsic evidence because the court concluded that the only extrinsic evidence that would trigger the exclusion also contradicted allegations of ownership in the claimant's underlying suit against the insured; therefore, the claimant's petition controlled, and the court ignored extrinsic evidence to the contrary. *See id.*

In sum, these cases represent the following broad approach to the eight corners rule: an exception to the eight corners ban on extrinsic evidence exists where the insurer either refuses to defend or defends under a reservation of rights. In these cases, the court may determine the insurer's duty to defend by examining the petition, the policy, and any extrinsic facts relevant to coverage that do not conflict with the liability facts pled by the claimant's petition against the insured. Thus, these cases indicate that a court may examine a broad range of extrinsic evidence, so long as adjudication of those facts based on that extrinsic evidence would not result in a conflict with the allegations made in the underlying lawsuit by the claimant against the insured. Therefore, if the Court were to follow the *Wade* line of cases, it could consider evidence of any facts that did not tend to contradict the claimant's allegations in the state court malpractice action.

### (b) *TriCoastal* Strict Eight Corners Approach

Importantly, no Texas Supreme Court case has followed *Wade. See Tri–Coastal Contractors, Inc. v. Hartford Underwriters Ins.*, 981 S.W.2d 861 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). Though Houston's First District Court first penned *Boll,* in *Tri–Coastal,* it declined to apply *Wade* and *Gonzales,* which both descended from *Boll. Id.* Thus, even the court that announced the decision on which the *Wade* line of cases depends has retreated from the broad version of the exception as it was set forth in *Boll. See id.* Also, it

12. Professor Ellen Pryor has argued that the courts should recognize the distinction between coverage-only and merits-only facts when deciding whether an insurance policy, such as malpractice insurance, covers a given claim made against the insured. She believes that courts should examine extrinsic evidence any time that the evidence goes only to coverage issues and does not overlap with the merits of the claimant's underlying liability suit against the insured. This approach, like that in *Wade* and *Gonzales,* suggests that where "pure" coverage facts can be proven with extrinsic evidence, the courts should not avoid making critical coverage determinations before the conclusion of the claimant's suit against the insured merely for fear of violating the eight corners rule. *See generally,* Ellen S. Pryor, *Mapping the Changing Boundaries of the Duty to Defend in Texas,* 31 Tex. Tech. L. Rev. 869, 890–898 (2000). Interestingly, Professor Pryor also acknowledges the uncertainties that might arise in eventually defining what are or are not "pure coverage facts." In discussing how courts should approach the duty to defend issue, she makes the following comments about distinguishing between merits-only and coverage-only facts: "The distinction is generally workable and understandable, and declaratory judgment courts in many jurisdictions have been employing it for some time. But abandoning the eight-corners rule for coverage-only allegations would elevate the practical import of the distinction and the uncertainties associated with it." *Id.* at 897.

appears that no other state appellate courts have followed *and applied* Wade. *See id.*[13] And given that all three of *Cook, Gonzales,* and *Wade* relied to some degree on the reasoning in *Boll,* that line of cases appears much weaker in the face of *Tri–Coastal.*

Admittedly, *Tri–Coastal* did not face *Wade* on all fours. The court noted that, even if the *Wade* rationale were valid, it did not need to apply it to the case then at hand. This is because the lower court examined evidence that would have barred the claimant (i.e. the party suing the insured) from recovering a judgment, not evidence that would bar only the insured from recovery under the policy. In short, *Tri–Coastal* concluded that the lower court's decision, which found no duty to defend, would have been reversed under both *Wade* and the strict approach because even *Wade* would prevent a court from admitting extrinsic facts to defeat the claimant's well pleaded petition (at least as to liability facts). *See id.* at 863; *Wade,* 827 S.W.2d at 453. So, *Tri–Coastal,* while appearing to disapprove of *Wade,* did not reject it altogether.

Another case, *Calderon v. Mid–Century Ins. Co. of Tex.,* also explains that *Boll* and *Cook* usually can be distinguished from most duty to defend situations. No. 03–97–00735–CV *3–4 (Tex.App.-Austin 1998, pet. denied) (no publication), *available at* 1998 WL 898471. In that case, the Austin appellate court noted that the types of coverage facts in *Boll* and *Cook* were "fundamental coverage issues whether the property or the individual were covered under the policy" *Id.* at *4; *see also Tri–Coastal,* 981 S.W.2d at 863 n. 1 (fundamental coverage issues consist only of (1) whether person sued is specifically identified as excluded, (2) whether property concerned is excluded, or (3) whether the policy exists). The court went on to hold that it could not examine extrinsic evidence that might prove that the exclusion applied; instead, it was bound by the allegations in the claimant's petition. *Id.*

In *City of Dallas v. Csaszar* the Dallas Court of Appeals highlighted the fact that no Texas Supreme Court case has applied the *Wade* exception to the eight corners rule. No. 05–99–00208–CV, n. 2 (Tex. App.-Dallas 1999, pet. denied) (no publication), *available at* 1999 WL 1268076. And the Dallas court has never applied the exception. *Id.* Therefore, after rejecting *Gonzales,* the court concluded that it must decide the insurer's duty to defend based on the eight corners of the underlying petition's allegations and the insurance

---

**13.** Some courts do cite the rule in *Wade,* but then they do not apply it. *See, e.g., Utica Lloyd's of Tex. v. Sitech Engineering Corp.,* 38 S.W.3d 260 (Tex.App.-Texarkana 2001, no pet.). Instead, they look merely to the allegations in the petition. *Id.* For example, in *Utica,* the court did ignore some statements made in the claimant's petition that would have avoided the application of an exclusion. But these statements were ignored because they were legal conclusions and not factual allegations. Thus, the court still examined *only* the pleadings, and it simply recognized that the facts alleged in the petition, rather than legal conclusions flowing therefrom, control whether the duty to defend is triggered. *See id.* at 264.

*Mid–Continent Cas. Co. v. Safe Tire Disposal Corp.,* 16 S.W.3d 418, 421 (Tex.App.-Waco 2000, pet. denied) is another example of a case that cites the *Wade* exception but does not appear to apply it. In that case, the court spent the bulk of its efforts construing the policy's pollution exclusion. But then it looked only to the amended complaint to determine coverage. *See id.* at 423. Thus, while some state appellate courts may cite *Wade* and recite its exception, the Court has not located any opinions, other than the ones previously cited in the text, that actually apply the exception.

policy's terms. It also noted that the duty to defend is determined without reference to what the parties know the true facts to be. *Id.* (citing *Argonaut Southwest Ins. Co. v. Maupin,* 500 S.W.2d 633, 635 (Tex. 1973)).

Interestingly, the *Csaszar* court even noted that the claimant had not specifically alleged a coverage fact, i.e. that the insured's employees had acted within the scope of their employment. Still, the court said, "any uncertainty about whether allegations in a complaint state a covered cause of action is resolved in the insured's favor." *Id.* at *4 (citing *Heyden,* 387 S.W.2d at 26). Thus, the Dallas court applies the strict eight corners approach, and it will not look to extrinsic evidence, even where that evidence might not conflict with the claimant's allegations in the underlying lawsuit.

### (c) Reconciling *Wade* with the Strict Eight Corners Approach

*Wade* is undermined by its own concurrence. The concurrence specifically took issue with "the majority's observations in *dicta* that [the insurer] may present evidence other than the plaintiff's pleadings in the underlying lawsuit." *See Wade,* 827 S.W.2d 448, 453 (Dorsey, J. concurring). Similar to *King* and other Texas Supreme Court opinions, the concurrence would have held that "whether the incident ... was covered by the policy should be determined solely from the plaintiff's pleadings in the underlying lawsuit." *Id.* at 454. The concurrence further noted that the duty to defend arises anytime there exists a possibility of coverage, i.e. that the duty exists regardless of the outcome of the underlying suit against the insured. *Id.*

Moreover, the *Wade* concurrence highlights that when Texas courts had previously examined extrinsic evidence in the context of an insurer's duty to defend, they

had done so only for a limited range of purposes. *Id.* One such purpose was to determine the existence of the contract, e.g. whether premiums had been paid. The concurrence discussed *Boll* and *Cook,* and it concluded that both cases inquired into similar fundamental coverage issues. Furthermore, it stated: "No courts have allowed evidence of the specific occurrence to determine whether the occurrence itself is covered by the policy, however." *Id.* And to the extent *Gonzales* might have recognized such a distinction, the concurrence also noted that extrinsic evidence would not be allowed into the equation to contradict allegations of fact by the claimant. Thus, "[e]xtrinsic evidence regarding coverage is admitted in very limited circumstances.... When determining whether the event giving rise to the insured's liability is covered, we look only to the pleadings of the claimant." *Id.*

Also, in *Cook,* the underlying litigation had already come to a conclusion. *See Wade,* 827 S.W.2d at 453. The statement of facts on which the appellate court relied in making its ruling reflected as much. Thus, while the *Cook* court concerned itself with coverage issues that ultimately affected whether the insurer had failed to honor its duty to defend, the court did not face the prospect of a range of possible factual determinations that might be decided by two different courts; the underlying claim had already been litigated. Similarly, the *Boll* case was not a declaratory judgment action sought before the conclusion of the underlying case. It was brought after the facts of the underlying claim were resolved. Thus, both cases were poised much differently than this case; no unresolved facts existed in the underlying claimant's case.

The Texas Supreme Court has persistently commanded that all doubts as to coverage are resolved in favor of the in-

sured; however, these pronouncements can be sharpened and restated. In short, the trends in Texas—as evidenced by state appellate opinions, by repeated similar statements by the Texas Supreme Court, and by academic observation in the journals—show that Texas currently follows a strict eight corners approach. Whether *Wade*'s analysis is workable or whether it creates an exception to swallow the rule is of no moment. The overwhelming recent trends in state law weigh against the extensive use of extrinsic evidence in deciding the duty to defend. Instead, exceptions to the rule are very rare indeed.

**(3) Conclusion: Texas Uses Extrinsic Evidence to Decide the Duty to Defend Only in Very Limited Circumstances.**

 Accordingly, the Court concludes that the concurrence in *Wade* represents the prevailing trend in Texas state law. "[I]f the petition only alleges facts excluded by the policy, the insurer is not required to defend. Similarly, if the petition only alleges facts that are covered by the policy, a duty to defend exists. Between these two poles, the presumptions of coverage exist." *See Wade*, 827 S.W.2d at 454–55 (Dorsey, J. concurring) (internal quotations/citations omitted); *see also King*, 85 S.W.3d at 187 (duty to defend decided solely by the pleadings); *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex.1965) (doubt resolved in favor of coverage); *see also Rhodes v. Chicago Ins. Co.*, 719 F.2d 116, 119 (5th Cir.1983) (applying Texas state law, citing *Heyden*).

 Only in very limited circumstances is extrinsic evidence admissible to rebut those presumptions. *Id.* These instances are ones in which "fundamental" policy coverage questions are resolved by "readily determined facts." *King*, 85 S.W.3d at

189 (readily determined fact, distinguishing *McManus*); *Calderon*, No. 03–97–00735–CV at *3–4, available at 1998 WL 898471 (fundamental coverage issues only); *Wade*, 827 S.W.2d at 454–55 (Dorsey, J. concurring); *see also Csaszar*, No. 05–99–00208–CV at n. 2, (no publication) (refusing to apply *Gonzales*, and thus, necessarily rejecting *Wade*), *available at*, 1999 WL 1268076; *Tri–Coastal Contractors, Inc.*, 981 S.W.2d 861 (diverging from *Boll*, and noting that no state appellate courts appear to follow *Wade*). These fundamental coverage issues include the following: (1) whether a person has been excluded by name or description from *any* coverage; (2) whether the property in suit has been expressly excluded from any coverage; and (3) whether the policy exists. *See Calderon*, No. 03–97–00735–CV, 1998 WL 898471 at *3–4; *Wade*, 827 S.W.2d at 454–55 (Dorsey, J. concurring). And determination of these "fundamental coverage issues" must be able to be made by a *readily determined fact* that does not engage the truth or falsity of the allegations in the underlying petition. *See King*, 85 S.W.3d at 187 ("The court should not imagine factual scenarios that might trigger coverage or read facts into the pleadings."); *see also Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973) (duty triggered if pleadings raise a potential for coverage); *Tri–Coastal*, 981 S.W.2d at 863 (cannot question merits of underlying suit).

These conclusions are consonant with the burdens that each party bears at this stage in litigation. The insured carries his burden by offering a petition against him that could possibly fall within coverage; so, the insured must demonstrate that the petition triggers the general coverage provisions. This represents the extent of the insured's burden. *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 99 F.3d 695, 701 (5th Cir.1996);

*Am. Equity Ins. Co. v. Castlemane Farms, Inc.,* 220 F.Supp.2d 809 (S.D.Tex.2002).

Once the insured has shouldered his burden, presumptions in favor of coverage attach,[14] unless a readily determinable fundamental coverage fact—which must be proven through the use of extrinsic evidence that does not overlap the merits of the claimant's underlying suit—excludes coverage as discussed above, e.g. no policy in effect between the parties, etc. *See Canutillo,* 99 F.3d at 701 (citing TEX. INS. CODE art. 21.58(b)insurer's burden to prove exclusions); *see King,* 85 S.W.3d at 187 (readily determined); *Calderon,* No. 03–97–00735–CV, 1998 WL 898471 at *3–4 (fundamental coverage facts); *Wade,* 827 S.W.2d at 454–55 (Dorsey, J. concurring) (limited purpose of extrinsic evidence-fundamental coverage issue). If no "fundamental coverage facts" are offered for the Court's consideration, then the Court must examine only the policy and the factual allegations contained in the underlying suit between the claimant and the insured to decide whether the insurer has a duty to defend.

### b. Applying Texas Law to Westport's Duty to Defend

### (1) The Parties Offer No Extrinsic Evidence of Fundamental Coverage Facts.

 In this case, the insurer and insured both offer stipulations of fact for the Court's consideration. The parties argue that the sum total of these stipulations decide whether the insurer has a duty to defend and the ultimate duty to indemnify. However, none of these stipulated facts go only to a fundamental coverage issue, such

as the existence of the policy or whether a named insured or specified property has been identified as being specifically excluded from any coverage. *See Tri–Coastal,* 981 S.W.2d at 863 n. 1.

Because the stipulations do not go solely to fundamental coverage issues, the Court may not consider the testimony elicited at the hearing held on October 11, 2002. That testimony, to which Westport (apparently correctly) objected, is not relevant when deciding the duty to defend. Because no evidence of basic coverage facts has been presented, the Court may not consider any extrinsic evidence, including the testimony and stipulations, in deciding both duties *before* the conclusion of the state court malpractice action. Therefore, the Court will examine only the facts alleged in the claimant's petition for malpractice, and it will not imagine, nor will it let the parties suppose, any facts to create coverage or to trigger the exclusion to defeat coverage. *See King,* 85 S.W.3d at 187 ("The court should not imagine factual scenarios that might trigger coverage or read facts into the pleadings."); *see also Argonaut Southwest Ins. Co. v. Maupin,* 500 S.W.2d 633, 635 (Tex.1973) (duty triggered if pleadings raise a potential for coverage).

### (2) Claimant's State Court Petition for Malpractice

 The parties submitted the claimant's state court petition to be considered alongside the insurance policy. *See* Dkt. No. 46. The "Plaintiffs' Fifth Amended Original Petition" is the most recent petition of which the Court has been made aware. The Keatons, the state court plain-

---

14. *See Wade,* 827 S.W.2d at 454–55 (Dorsey, J. concurring); *see also King,* 85 S.W.3d at 187 (duty to defend decided solely by the pleadings); *Heyden Newport Chem. Corp. v. Southern Gen. Ins.Co.,* 387 S.W.2d 22, 26

(Tex.1965) (doubt resolved in favor of coverage); *see also Rhodes v. Chicago Ins. Co.,* 719 F.2d 116, 119 (5th Cir.1983) (applying Texas state law, citing *Heyden* ).

tiffs, allege breaches of fiduciary duties and contract, negligence, and violations of the DTPA. Each of these theories of recovery focuses on the legal advice that the Atchley Russell firm provided the family over the course of several years. The petition specifically avers that distinct acts of wrongdoing occurred in each of the years 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, and 2001.

More specifically, the Keatons allege that their attorneys breached their fiduciary duties in at least one of nine different categories. These include, *inter alia*, failure to use due care while completing tax forms, estate plans, wills, and in rendering estate planning services. They also allege that the firm failed to use due care in representing the family in negotiations with the IRS. Other allegations include negligent misrepresentation related to the firm's characterization of IRS assessments of the family's tax liability, failure to advise the family of potential malpractice claims against the firm, negligently representing the consequences of a settlement with the IRS, and failing to confess to the family all of the firm's mistakes, transactions, and activities related to the representation of the family. Plaintiffs allege no more specific facts than this.

The Court construed the policy exclusion in a previous section. A summary of how the contract has been construed is this. Coverage is excluded in the following three scenarios:

1. the insured subjectively knew that the client intended to bring a claim, regardless of whether the insured breached a duty or not;

2. the insured subjectively knew of facts

 (a) that a reasonable attorney would conclude amounted to a blatant or glaring breach, the severity of

which would lead any reasonable attorney to expect a claim; or

 (b) that would lead a reasonable attorney to conclude both (1) that some, at least minimal, actual breach of professional duty probably did occur; *and* (2) that other facts known to the insured, such as a client's expression of dissatisfaction with the representation, indicated the client's intent to bring a claim.

First, the petitions' factual allegations do not trigger the exclusion's subjective prong. The state court petition does not allege that any member of the firm had subjective knowledge that a claim would be filed against it prior to the policy period. To the extent there are no allegations of the same, the Court will not imagine facts to defeat coverage. Therefore, in the context of the duty to defend, the policy's exclusion, based on the insured's subjective knowledge of a claim, must fail. For example, the claimant in the underlying malpractice suit could recover on facts that proved the attorney was aware of a claim, or the claimant could recover on facts that prove that the attorney had no prior knowledge of the claim. Thus, the petition states a claim that would potentially be covered with respect to the subjective knowledge exclusion. *See Chiriboga v. State Farm Mut. Auto. Ins. Co.*, 96 S.W.3d 673, 680 (Tex.App.-Austin, no pet. h.) (liability policies cover any *potential* claim, citing *Texas Med. Liab. Trust v. Zurich Ins. Co.*, 945 S.W.2d 839, 842 (Tex.App.-Austin 1997, writ denied) and *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 24 (Tex.1965)).

Second, nothing in the allegations suggests that any of the highlighted wrongs were so blatant that any lawyer would expect to see a claim because of them. The state court proceedings, however, may

develop the actual facts in such a way that the exclusion may yet be triggered. But the actual facts are not relevant here; only the facts that are alleged are relevant. The Court will not add detail to the factual allegations to defeat coverage. Therefore, the second scenario explained in the exclusion language has not arisen on the petition's factual allegations, and the exclusion cannot remove the insurer's duty to defend. *See id.* (any *potentially* covered claim must be defended).

Third, taking the petition's allegations as true and in the best light as to coverage requirements, it is still clear that the Keatons allege that the insured breached their duties *before* the policy period. This bare observation appears to be the sole foundation for Westport's Complaint for Declaratory Judgment. The insurer's Complaint lists the nine categories on which the state court claimants base their claims, and then the insurer concludes:

> Upon information and belief all [of the alleged acts] occurred prior to the effective date of the Westport Policy. Therefore, it appears that an Insured knew or could have reasonably foreseen that such acts, errors, omissions or circumstances might be expected to be the basis of a Claim.

Plaintiff's Complaint ¶ 24. From these two sentences alone, the insurer's position becomes clear. If an attorney's client might be able to make out a case for a breach of fiduciary duty based on an act prior to the claims-made policy period, the insurer believes the claim must be excluded. Apparently, only if the claim is groundless or frivolous would the insurer admit coverage. After all, only groundless claims would lead the insurer to conclude that the attorney should not have known about the claim.

While this is a convenient interpretation for the company, it is not consonant with the parties' reasonable expectations, and as previously explained, it is not in line with the Court's construction of the exclusion language. The insurer must do more than merely point out that a wrongful act occurred prior to the policy period in order to demonstrate that the insured either subjectively knew or should have known that the action in question would be the basis of a claim. The insurer cannot make out such proof from the factual allegations in the state court petition. Therefore, the insurer has not proved up the exclusion, and the insurer still must defend its insured.

Moreover, the Keaton family alleges that the firm engaged in distinct and separate wrongful acts during 2001. Thus, they allege that acts occurred both *before* and *after* the inception of the policy here in issue. This allegation alone, if true, would avoid the exclusion in the policy. This is because the policy exclusion applies only to acts that occurred before the policy period, which began in January, 2001. And the clear rule is that where some of the allegations fall inside coverage and some do not, the duty to defend is still triggered. *See Chiriboga*, 96 S.W.3d at 680 (liability policies demand a defense of any *potential* claims), *citing Texas Med. Liab. Trust*, 945 S.W.2d at 842; *Heyden Newport Chem. Corp.*, 387 S.W.2d at 24. Thus, allegations that wrongful acts occurred during the policy period, taken as true here, prevent the exclusion from defeating the duty to defend.

Westport's only basis for the Court to grant it relief was that the acts occurred prior to the policy period, and therefore, that they were excluded as outside the policy's coverage. Aside from arguing that the exclusion applies, the insurer does not allege that the state court petition would not otherwise trigger the coverage provisions of the policy. Therefore, having

determined that the exclusion does not defeat coverage and noting that Westport does not otherwise dispute coverage, the Court concludes that the duty to defend has been triggered by the state court petition. For these reasons, Westport's Motion for Summary Judgment on the duty to defend must be DENIED. Also, Defendant Atchley Russell's Motion for Summary Judgment on the duty to defend should be GRANTED in PART.

## B. DUTY TO INDEMNIFY

### 1. Westport's Motion for Summary Judgment

Westport's Motion for Summary Judgment urges the Court to find no coverage and no duty to defend. If the Court were to find that the insurer had no duty to defend, Westport argues that Texas law would allow the Court also to decide that the same reasons that defeated the insurer's duty to defend also preclude it from having the ultimate duty to indemnify. After reviewing the insurance policy and the state court petition, the Court now has ruled that the exclusion does not defeat coverage, at least in the context of assessing the insurer's duty to defend. Thus, the insurer's duty to defend has been triggered. Therefore, because the Court did not find that the duty to defend was defeated by the exclusion, it cannot find that the same reasons said to defeat the duty to defend also eliminate the duty to indemnify. Therefore, Westport's Motion for Summary Judgement on the duty to indemnify will be DENIED.

### 2. Defendants' Motion for Summary Judgment

Defendants counterclaimed for declaratory judgment. They sought a two-fold declaration: (1) that Exclusion B did not deny coverage for the duty to defend; and (2) that Exclusion B did not defeat coverage as relates to Westport's duty to indemnify. The Court has ruled that Exclusion B, at least under a duty to defend analysis, does not defeat coverage. Therefore, the insurer has a duty to defend. Thus, what remains for the Court to determine is whether Exclusion B defeats coverage under an analysis appropriate for deciding the duty to indemnify.

■ Importantly, Texas recognizes that the duty to defend and the duty to indemnify are distinct and separate duties. *King v. Dallas Fire Ins. Co.,* 85 S.W.3d 185 (Tex.2002) (citing *Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex.1997)). Texas applies an eight corners rule when deciding the duty to defend. *Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex. 1997). Facts, however, not allegations, determine an indemnitor's duty to indemnify. *See Tesoro Petroleum Corp. v. Nabors Drilling, USA, Inc.,* 106 S.W.3d 118, *5 (Tex.App.-Houston [1st Dist.] Dec. 12, 2002, no pet.), *available at* 2002 WL 31771135. "The duty to defend may be triggered by the pleadings, but the duty to indemnify is based on the jury's findings." *Id., citing Farmers Tex. County Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 82 (Tex. 1997). Thus, the actual facts determined in the underlying litigation, or as otherwise made available, determine whether the insurer has the duty to indemnify. *See Chiriboga v. State Farm Mut. Auto. Ins. Co.,* 96 S.W.3d 673, 680 (Tex.App.-Austin, not pet. h.) (citing *Trinity Univ. Ins. Co. v. Cowan,* 945 S.W.2d 819, 821 (Tex.1997)).

Here, the state court action is still pending, and as a result, this Court does not yet have the benefit of the actual facts that will be determined there. However, the insured and the insurer both have agreed on many stipulations of fact. Both parties urge the Court to rule on the coverage

issue based on these stipulations. Both parties have represented further that none of these stipulations of fact, nor the conclusions that would be reached by this Court on those facts, could possibly overlap the facts and conclusions that the state court has yet to make in connection with the underlying malpractice lawsuit.

 What the parties request presents a difficulty for the Court in attempting to apply state law, pursuant to its obligations under diversity jurisdiction and under *Erie*. This is because Texas state law generally prohibits the determination of the duty to indemnify before the conclusion of the claimant's underlying litigation against the insured (i.e. the Keatons' malpractice suit). *See Firemen's Ins. Co. v. Burch*, 442 S.W.2d 331, 332 (Tex.1968), *as modified by Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997). The Texas Supreme Court approves of deciding whether an insurer has a duty to indemnify before the conclusion of the underlying litigation in only one, narrowly confined situation, as follows: it is appropriate only when the duty to defend analysis, which looks exclusively to the eight corners of the state court petition and the policy, indicates that no set of alleged facts would provide coverage, and because of *the very same reasons*, no duty to indemnify could arise.

Here, the Court has concluded that the state court petition does not allege only those facts that would necessarily preclude coverage. Therefore, the presumptions of coverage remain, and the insurer still bears the duty to defend. The Court has found no Texas case in which the Court announced that, applying Texas state law, the duty to defend was triggered, and

simultaneously decided that the duty to indemnify could not arise for lack of coverage. Notably, every case that the Court has found that decides the duty to indemnify before the conclusion of the underlying suit has rejected coverage for both the duty to defend and the duty to indemnify. Those federal courts that do decide such issues before the conclusion of the underlying suit do so on what appears to be two related theories.

### 1. Whether the Court may Reach the Duty to Indemnify Before the Conclusion of the State Court Proceedings

The first group of federal courts appear to follow *Wade*. Thus, they consider evidence extrinsic to the underlying petition and the policy, apparently improperly, when considering the duty to defend. This extrinsic evidence invariably leads the court to conclude that no coverage exists for the claim. Because this Court has rejected *Wade*, it will not now invoke that line of reasoning to decide the duty to indemnify. As a result, the Court necessarily declines to follow those federal cases that examine extrinsic evidence in the context of the duty to defend to determine coverage. *See* discussion, *supra*, pp. 611–613.

### (a) *Ohio Casualty Insurance Company v. Cooper Machine Company*

The second group of federal cases that reach the duty to indemnify before the conclusion of the state court litigation does so by relying on the authority given to the federal courts by the Declaratory Judgment Act. *See* 28 U.S.C. § 2201.[15] One

---

**15.** The Court notes that at least one Fifth Circuit opinion cites *Western Heritage Ins. Co. v. River Entertainment*, 998 F.2d 311, 315 (5th Cir.1993) for the following proposition: "An

actual controversy may exist when an insurance carrier seeks a declaratory judgment that it has a duty neither to defend nor indemnify its insured in a state court action that has

District Court opinion from our circuit explained its reasoning for reaching the duty to indemnify early as follows:

> The circumstance that a state court of Texas would not entertain the action as against the claimant [ ] or for a declaration as to [the insurer's] payment obligation under the policy does not cause this court, in this federal declaratory judgment action, not to be able to proceed to make a full declaration as sought by the [insurer].

*Ohio Cas. Ins. Co. v. Cooper Mach. Corp.,* 817 F.Supp. 45, 47 (N.D.Tex.1993) (McBryde, J.) (citations omitted). The court continued:

> Under the declaratory judgment practice of courts of the State of Texas plaintiff would not be entitled to a declaration related to its payment obligation, *Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331 (Tex.1968), nor would plaintiff be entitled to a declaration against [ ] the state court claimant, *Providence Lloyds v. Blevins,* 741 S.W.2d 604 (Tex.App.—Austin 1987, no writ). However, the federal courts have a more sensible view of the goal of declaratory judgment practice and have approved declarations on those subjects, which are essential to a full resolution of insurance coverage disputes of the kind involved in this action.

*Ohio Cas. Ins. Co.,* 817 F.Supp. at 47 n. 1. Thus, the court appears to have considered the Texas Declaratory Judgment Act to be purely procedural in nature, rather than substantive; therefore, the court perceived that no state substantive law restrained the court from proceeding under the Federal Declaratory Judgment Act, which is also strictly procedural. *See also Utica Lloyd's of Texas v. Mitchell,* 138 F.3d 208, 210 (5th Cir.1998) (refusing to provide attorneys' fees under the Texas Declaratory Act because the Act was considered strictly procedural; therefore, it provided no substantive state law grounds for awarding attorneys' fees).

Likewise, *Cincinnati Ins. Co. v. Holbrook,* 867 F.2d 1330 (11th Cir.1989) reached a similar conclusion. It examined Georgia law. Georgia state law prohibited state courts from issuing declarations of rights as to coverage before the claimant's underlying case against the insured was resolved. The federal court labeled the state rule purely procedural. The court further noted that a "case or controversy" existed that could trigger diversity jurisdiction. Therefore, it concluded that the insurer had a right both to be in a federal forum and to receive a declaration of rights pursuant to the procedural mechanisms afforded in the Federal Declaratory Judgment Act, even if the state would not

---

not yet proceeded to judgment. The district court thus had jurisdiction to rule on the duty to indemnify despite the fact that the underlying state court suit had not yet reached final judgment." *See Am. States Ins. Co. v. Bailey,* 133 F.3d 363 (5th Cir.1998). Critically, however, *Western Heritage* affirmed the district court's decision that the insurer had no duty to defend. Consequently, the circuit modified the judgment to reflect what the district court also impliedly held, that the insurer, *for the same reasons it had no obligation to defend, it had no duty to indemnify.* Ruling on the duty to defend in this context is expressly accepted in the state courts. *See Farmers Texas County*

*Mutual Insurance Co. v. Griffin,* 955 S.W.2d 81 (Tex.1997). Therefore, to the extent *Western Heritage* provides support for making declarations of insurer's duty to indemnify before the conclusion of the underlying suit, it does so only in the same context as that described in *Griffin.* Because this case is now in a different posture than encountered by *Griffin,* Western Heritage and the cases that rely on it appear highly distinguishable. Thus, they do not provide support for declaring the parties rights as to indemnification because the Court already has concluded that the duty to defend has been triggered.

so accommodate the insurer. *Id; see also State Farm Mut. Auto. Ins. Co. v. Bates,* 542 F.Supp. 807 (N.D.Ga.1982) (analyzing only whether Article III "case or controversy" requirements were met and noting that the FDJA was procedural only, not substantive).

As for the other case that *Ohio Casualty Insurance Company v. Cooper Machinery Corporation* cites for authority, *Maryland Casualty Company v. Pacific Coal & Oil Company,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), that case examines only whether a declaratory judgment action brought by an insurer to determine coverage before the underlying litigation against the insured terminates presents an Article III "case or controversy." In that case, the claimant suing the insured had a statutory right to proceed against the insurer if the judgment was not paid within a short period after judgment was entered. In that context, the court found Article III jurisdiction present because an actual case or controversy existed among the claimant, the insured, and the insurer. Thus, the case said nothing about whether a prohibition in state law (whether substantive or pejoratively labeled as "procedural") would limit the relief available to the parties in the federal forum under *Erie.* Instead, the court asked only whether it had diversity jurisdiction, not what the effect of state law was on the relief available to the parties.

#### (b) *Monticello Insurance Company v. Patriot Sec., Inc.*

An Eastern District of Texas case also cites *Maryland Casualty Company* for the same proposition. *See Monticello Ins. Co. v. Patriot Sec., Inc.,* 926 F.Supp. 97 (E.D.Tex.1996) (Cobb, J.). That case goes farther than *Ohio Casualty Insurance Company* did to explain its position. *See id.* at 100. ("[I]mportant issues of federalism and comity are overlooked without providing a few more steps of analysis."). *Monticello* examined *Burch,* and the court declared that the *"Burch* doctrine" was *"founded upon an incorrect interpretation of federal law." Id.* (emphasis added). The court gave no citation for this proposition. First, the court framed the question as follows: Whether the jurisdictional minimum is met in a declaratory judgment action invoking diversity jurisdiction? Whether the jurisdictional amount was met affected whether the court had diversity jurisdiction. If the court held that no amount in controversy existed prior to a judgment being entered in the claimant's underlying lawsuit against the insured, then the action would not present a sufficient amount in controversy to invoke federal jurisdiction.

Next, the *Monticello* court said: "Because the Texas Supreme Court has established that the *Burch* doctrine is an application of federal constitutional law (namely, Article III), this court is obligated to review that analysis." *Id.* at 101. Notably, the court did not provide a citation to a case that points out *Burch*'s purported reliance on federal law. Nonetheless, after making that observation, the court concluded that it must apply the mandate rule. *See Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (where a state interpretation of federal law varies from federal interpretation, the state interpretation is ignored). Doing so, the court concluded that the clear interpretation of Article III is that an actual case or controversy existed in that instance. Thus, the court had jurisdiction and declined to dismiss.[16] Howev-

---

**16.** To the extent *Monticello* meant only to ignore *Burch* for the purposes of evaluating

whether the jurisdictional minimum required for asserting diversity jurisdiction is met in

er, having assured itself of its jurisdiction, the court then determined that matters of economy militated against deciding the case; therefore, the court used its discretion not to decide the matter of indemnification "at this time." *Id.*

The Court has reviewed cases discussing the *"Burch* Doctrine." Contrary to the assertion made in *Monticello,* these cases do not indicate that *Burch*'s reasoning was based on an incorrect interpretation of the Federal Constitution. For example, in *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993), the Texas Supreme Court made the following observation: "Thus, we have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department." *Id., citing Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 333 (Tex.1968). This language admits that recent Texas Supreme Court jurisprudence recognizes that *Burch* flows from an interpretation of the state constitution, not the federal one.[17] Indeed, *Burch* itself states: "This court has repeatedly held that under our Constitution, the judicial power does not embrace the giving of advisory opinions." *Burch,* 442

S.W.2d at 333, *citing Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641 (1933). *Morrow,* in turn, discusses only the state constitution. *See, e.g., Morrow,* 62 S.W.2d at 651; *see also* TEX. CONST. art. V, § 8. Thus, it is clear that even if the federal courts disagree with *Burch*'s reasoning, the fact that the case's conclusions descend from state law mandates that the state courts bear the responsibility of reversing it, if they deem it appropriate. As *Burch* does not engage any federal law, but instead states a matter of state law, the Court cannot follow the reasoning in *Monticello* to conclude that *Burch* should be ignored.

#### (c) Procedure versus Substance

Federal courts give different degrees of deference to state law, depending on whether the state rule is procedural or substantive. Significantly, the courts recognize that a bright-line, mechanical distinction between procedural and substantive law often does not suffice. *See Allstate Ins. Co. v. Charneski,* 286 F.2d 238, 241–42 (7th Cir.1960). In *Allstate,* the court quoted Justice Frankfurter from *Guaranty Trust Co. v. York,* 326

---

these types of actions, this Court agrees. However, the Court must disagree with *Monticello*'s derogation of *Burch* to the extent that the federal court's interpretation interferes with the application of state insurance law, as opposed to federal "amount in controversy" jurisdictional jurisprudence.

17. It is true that for some issues Texas will examine how federal courts deal with similar questions under federal law. For example, when addressing standing, the Texas high court first considered its own articles of separation. Then, noting that the separation of powers article was not the only basis for standing, the court noted what Article III requires *in the federal courts. See Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). The Texas Supreme Court has integrated the federal con-

cept of standing into its jurisprudence on subject matter jurisdiction. *Id.* at 445. But this is only a component of state subject matter jurisdiction; nothing suggests that standing, as interpreted by the federal courts, has supplanted the interpretation of the state constitution that precludes state courts from providing advisory opinions. And under the state's interpretation of insurance law and its constitution, it is clear that determining the duty to indemnify before the conclusion of the underlying action against the insured is considered a prohibited advisory opinion, at least in most instances. In any case, *Burch* clearly interprets state law under the state constitution; therefore, its prohibitions, which do not touch on matters of federal law, cannot be trumped by federal interpretation of the U.S. Constitution's Article III.

U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), in which he said:

> Here we are dealing with a right to recover derived not from the United States but from one of the States. When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identical. But since a federal court adjudicating a state-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State, it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State. And so the question is not whether a statute of limitations is deemed a matter of 'procedure' in some sense. The question is whether such a statute concerns merely the manner and the means by which a right to recover, as recognized by the State, is enforced, or whether such statutory limitation is a matter of substance in the aspect that alone is relevant to our problem, namely, does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court? ... The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away, should not lead to a substantially different result.

*Id.* In this sense, then, the Court must ask whether making a determination now, as opposed to after the conclusion of the state court proceedings, could lead to a different result in the way the state's rules pertaining to insurance are applied. If it could, then the rule is substantive, and the federal Court must follow the state rule. If not, it is procedural, and the Court is not constrained by diversity jurisdiction's general deference to state law.

Here, Texas has chosen to place certain risks on the insurer. The insured can turn to the insurer for a defense when a claimant sues him. "When an insurer is faced with the dilemma of whether to defend or refuse to defend a proffered claim, it has four options: (1) completely decline to assume the insured's defense; (2) seek a declaratory judgment as to its obligations and rights; (3) defend under a reservation of rights or a non-waiver agreement; or (4) assume the insured's unqualified defense." *See Farmers Texas County Mut. Ins. Co. v. Wilkinson,* 601 S.W.2d 520, 522 (Tex.Civ.App.-Austin, writ ref'd n.r.e.).

Each of these choices incurs certain risks. For example, if the insurer has knowledge of facts to indicate that there is no coverage, but nevertheless proceeds to provide an unqualified defense for the insured, the insurer may be estopped from later raising coverage defenses. *See Katerndahl v. State Farm Fire & Cas. Co.,* 961 S.W.2d 518, 523 (Tex.App.San Antonio 1997, no writ). But if an insurer provides a defense subject to a reservation of rights, it accepts the duty to pay for the defense, though it may later contest coverage for indemnification. And even though the insurer may withdraw if subsequently obtained facts indicate that there is no coverage, the insurer likely still risks losing the costs of having provided the defense to that point. *See Am. Eagle Ins. Co. v. Nettleton,* 932 S.W.2d 169, 174 (Tex. App.—El Paso 1996, writ denied) (insurer may withdraw if fact of no coverage becomes clear). Thus, the insurer can reserve its rights, to be litigated at a later time or in a separate declaratory judgment

action, but it risks giving up the cost of the defense in return for maintaining some control over the defense.

On the other hand, the insurer could refuse to provide a defense outright, asserting that no coverage exists. *See, e.g., E & L Chipping Co., Inc. v. Hanover Ins. Co.,* 962 S.W.2d 272, 274 (Tex.App.-Beaumont 1998, no pet.) (where insurer refused defense, insured took up its own defense and sued the insurers, unsuccessfully, to recover the cost of the defense). In this scenario, if the insurer's determination of coverage is correct, it does not incur any expenses related to any portion of the defense. Likewise, it bears no duty to pay any judgment entered against the insured in the claimant's underlying lawsuit. On the other hand, where the insurer chooses not to assume the defense obligations, it also gives up control of the defense. Thus, if its determination of coverage is incorrect, the insurer may ultimately be out of pocket for the defense costs incurred by the insured and for the amount of any judgment in the underlying suit, over which the insurer also failed to exercise any control. Therefore, it is clear from the choices given to an insurer when faced with a request for coverage that Texas courts allow the insurers to weigh the risks and consequences as to whether to provide a defense.

Even where the insurer seeks a declaration of rights, pursuant to providing a defense under a reservation of rights, Texas courts will only provide relief to the insurer in certain situations. *See Firemen's Insurance Co. v. Burch,* 442 S.W.2d 331 (Tex.1968) (general rule is that *duty to indemnify* is not justiciable in Texas courts before the underlying litigation ends), *as modified by Farmers Texas County Mutual Insurance Co. v. Griffin,* 955 S.W.2d 81 (Tex.1997). One such situation is where "fundamental coverage facts" that may be readily determined by extrinsic evidence preclude both duties from arising. *See* discussion, *infra,* Part I.2.a. Another circumstance is where the suit against the insured, by its own allegations, proves that no coverage exists.

Only in these two situations does Texas find it appropriate to remove the risks inherent in the choices forced on insurers about whether to provide a defense, as noted above.[18] In all other cases, the insurer bears the risk that its choice whether to provide a defense or not to provide a defense will impact it negatively after judgment in the suit between the insured and the claimant is entered. In short, the options open to insurers in Texas appear to encourage only good faith challenges to the duty to defend and also encourages insurers to provide the insured with a defense while coverage issues are resolved.

After all, insurers are in the business of weighing risks, and the choice to place that task in their hands, subject to possible negative consequences for making an incorrect determination on coverage, is no less than a policy choice.[19] To limit

---

**18.** *See Foust v. Ranger Ins. Co.,* 975 S.W.2d 329, 332 n. 1 (Tex.App.San Antonio 1998, pet. denied) (noting that *Burch* is still valid, except where duty to defend is not triggered and for the very same reasons, the duty to indemnify cannot arise).

**19.** The Court also notes that Texas requires the insurer to make its decision about whether to provide or deny a defense promptly. This is because the benefits under a policy's duty to defend represent a type of first party insurance to which Texas prompt payment statutes apply. TEX. INS. CODE ANN. art. 21.55 (Vernon Supp.2000); *see also Mt. Hawley Ins. Co. v. Steve Roberts Custom Builders, Inc.,* 215 F.Supp.2d 783, 794 (E.D.Tex.2002) (Brown, J.) (citing *Ryland Group, Inc. v. Travelers Indemnity Co. of Illinois,* 2000 WL 33544086 (W.D.Tex.2000), which relied on Ellen S. Pryor, *Mapping the Changing Boundaries of*

what relief is available to insurers by way of declaratory judgment tilts those considerations in favor of the insured by increasing the likelihood that insurers will provide a defense, even if it is provided under a reservation of rights. To allow the insurer to accomplish in the federal forum what the state courts would deny the insurer goes against the teachings in *Erie*. This is because to do so would change materially the nature of the risks that Texas law imposes on an insurer in deciding whether to admit coverage, to provide a defense or to pay a claim. In some instances, an early declaration of rights could disturb the balance achieved by Texas law.[20] Therefore, the insurer should not be able to achieve in this action prematurely what it would be denied in the state courts under state law.[21]

Moreover, to give *Griffin* anything but a narrow interpretation[22] and to reach the duty to indemnify before the conclusion of the underlying suit would be to eviscerate completely Texas' complaint allegation rule. For if the courts simply could proceed to the indemnification question and examine extrinsic facts to make coverage determinations there before the underlying suit terminates, then the court would never be constrained by the limitations imposed by the eight corners rule in the duty to defend analysis; it would always

---

the Duty to Defend in Texas, 31 Tex.Tech. L.Rev. 869, 930 n. 317 (2000)). Forcing the insurer to decide promptly also increases the likelihood that the insurer will accept the duty to defend, even if it reserves its rights as to indemnification.

**20.** "Secondly, it is most incongruous to attribute to the legislature and judiciary of [Texas] the imposition of a restriction against all its citizens from suing for a deficiency judgment while impliedly authorizing citizens of other States to secure such [declaratory] judgments against [Texans]. * * * The essence of diversity jurisdiction is that a federal court enforces State law and State policy." *See Allstate Ins. Co. v. Charneski*, 286 F.2d 238, 241–42 (7th Cir.1960), *quoting Angel v. Bullington*, 330 U.S. 183, 191–192, 67 S.Ct. 657, 91 L.Ed. 832 (1947).

**21.** Unlike those opinions that discuss whether coverage cases such as this present an Article III "case or controversy," such declarations are prohibited here as a matter of state interpretation of the state constitution. *Firemen's Insurance Co. v. Burch*, 442 S.W.2d 331 (Tex. 1968) (general rule is that *duty to indemnify* is not justiciable in Texas courts before the underlying litigation ends), *as modified by Farmers Texas County Mutual Insurance Co. v. Griffin*, 955 S.W.2d 81 (Tex.1997). While it is true that *Burch* looked to common law tradition, from which both the Texas Constitution and the Federal Constitution borrowed, the

mere fact that the two constitutions share similar backgrounds does not mean that both of them, each enacted by a different sovereign, have the same meaning. The federal courts should not substitute their views on justiciability, as developed under the Federal Constitution, for those espoused by the state courts based on their own state constitutions where the case concerns only state law issues. State law precludes a determination of the duty to indemnify, a duty created by state insurance and contact law, before the underlying litigation concludes; so, this Court cannot apply state law, by way of its diversity jurisdiction, to reach a different conclusion. To do otherwise is to invade the state's sovereignty in violation of the core principles of federalism.

**22.** Admittedly, *Griffin* did hold, contrary to *Burch*, that the duty to indemnify is justiciable in some circumstances. However, *Griffin* did not completely overrule *Burch*. Subsequent Texas courts of appeals cases explain that *Griffin* merely carved out an exception to *Burch*'s nonjusticiability holding. *See Foust v. Ranger Ins. Co.*, 975 S.W.2d 329, 332 n. 1 (Tex.App.San Antonio 1998, pet. denied). *Griffin* specifically held only that the "duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." Griffin*, 955 S.W.2d at 84 (emphasis in original).

be free to examine extrinsic evidence because it would always be free to skip ahead to decide indemnification. And extrinsic evidence of coverage should not be considered unless it relates to a readily determined fundamental coverage fact that has no possibility of overlapping with factual determinations to be made in the claimant's underlying action against the insured (e.g. the malpractice case). *See King,* 85 S.W.3d at 189; *Calderon,* No. 03–97–00735–CV at *3–4, *available at* 1998 WL 898471; *Wade,* 827 S.W.2d at 454–55 (Dorsey, J. concurring); *see also Csaszar,* No. 05–99–00208–CV at n. 2, (no publication), *available at* 1999 WL 1268076; *Tri–Coastal Contractors, Inc.,* 981 S.W.2d 861. Therefore, Texas notions of justiciability, developed under its constitution rather than the Federal Constitution, must be considered alongside the state's application of a strict eight corners approach to the duty to defend.

In conclusion, Texas state law precludes this Court from deciding the duty to indemnify before the conclusion of the state court proceedings. State law, based on interpretation of the state constitution, does not view these determinations as they are presented in this case as justiciable, regardless of whether they would be considered a "case or controversy" for the purposes of Article III. Therefore, while the Court has jurisdiction by way of diversity to decide the duty to defend, state law will not allow it to decide the insurer's duty to indemnify at this time in this case. The Court may not examine extrinsic facts to determine coverage issues and the duty to indemnify where the underlying state court petition has been found to trigger the duty to defend under the policy and where that same, underlying litigation has not come to a close.

## 2. Alternatively, the Court Exercises its Discretion Not to Make a Declaration of Rights as to the Duty to Indemnify at This Time.

 Even assuming that the Court could make this determination, it would not. The Court has discretion to decline to grant relief as to the duty to indemnify. While this discretion is not boundless, it is appropriately used in this case. *See, e.g., Wilton v. Seven Falls Co.,* 515 U.S. 277, 289–90, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); *Hollis v. Itawamba County Loans,* 657 F.2d 746 (5th Cir.1981). "The Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." *See Paschal v. Lykes Bros. S.S. Co.,* 264 F.Supp. 836, 839 (S.D.Tex.1966) (quoting *Public Affairs Assocs. v. Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 7 L.Ed.2d 604, (1962)).

 One basis that has been held within the Court's discretion for declining to declare certain rights is the desire to avoid unnecessary conflict with other courts, be they state or federal forums. *See Employers' Liability Assur. Corp. v. Mitchell,* 211 F.2d 441 (5th Cir.), *cert. denied,* 347 U.S. 1014, 74 S.Ct. 869, 98 L.Ed. 1137 (1954). Here, according to the Court's construction of the policy, at least some facts determined here could overlap those decided in state court. For example, to conclude that a glaring breach occurred (the likes of which would make any reasonable attorney expect a claim to be filed), the Court necessarily must decide whether a breach actually did occur. The state court could conclude that no breach occurred. Similarly, the Court could conclude that the insured should not have expected a claim because no actual breach of professional duty occurred, while the state court could enter a judgment indicating that some

breach did occur. Ruling in either way might very well conflict with findings yet to be made in the state court.

■ Also, the Sixth Circuit has held it an abuse of discretion to grant relief pursuant to the Declaratory Judgment Act where a state law of first impression is presented. *See Omaha Prop. & Cas. Ins. Co. v. Johnson,* 923 F.2d 446 (6th Cir. 1991). In so concluding, the court outlined five factors by which to determine whether relief should be granted. It concluded by saying that whether the "court should entertain such action is a matter of discretion based on weighing consideration of equity, comity and federalism, the uncertain effect of *res judicata* and the tendency of such a decision to be a partial end run around the authority of state courts to adjudicate claims falling within their jurisdiction." *Id.* (quoting in part, *Green v. Mansour,* 474 U.S. at 72–73, 106 S.Ct. 423, quotations omitted). The court concluded: "For the federal courts to preempt the right of the state court to rule on a previously undetermined question of state law, more must be present than the desire of the insurance company to avoid an unfavorable ruling in state court by convincing the federal court to rule first." *Id; see also* Ellen S. Pryor, *The Tort Liability Regime and the Duty to Defend,* 58 MD. L. REV. 1, 34 n. 125 (1999) (some federal courts have disallowed declaratory judgment action where unsettled issues of state insurance law would be engaged, citing, *e.g. North E. Ins. Co. v. Northern Brokerage Co.,* 780 F.Supp. 318, 322 (D.Md.1991)).

Here, neither party has cited, nor has the Court located, any state court opinions construing similar insurance policy exclusion language. The parties do, however, cite to other federal district court cases construing the policy language. The dearth of state court opinions addressing this exclusion and the relative abundance of federal court opinions on the same un-

derscores the "end run" element of the Sixth Circuit's considerations, namely, that the state courts were being denied the opportunity to adjudicate previously undetermined questions of state insurance contract law. *See Omaha Prop. & Cas. Ins. Co.,* 923 F.2d 446; *see also North E. Ins. Co.,* 780 F.Supp. at 322. Thus, applying the Sixth Circuit's reasoning, the fact that the Court could find no state court precedent on similar exclusions suggests that the Court should not grant declaratory relief at a time when no party could approach the state court for such relief. The Court ought at least only decide those matters which the parties could have litigated in either forum. At present, both the federal and the state courts would reach the duty to defend, but regardless of whether the federal court could reach indemnification now, the state courts could not.

In conclusion, the specter of conflicting factual determinations, the need to at least provide an opportunity for state courts to determine state law questions of first impression, and for reasons of economy, (i.e. not making a determination if none is ultimately required) convince the Court to exercise its discretion not to decide whether the insurer will ultimately bear the duty to indemnify at this time. To do so would needlessly encourage out-of-state parties to avail themselves of remedies not available under state law to in-state parties. Therefore, Defendants' Motion for Summary Judgment on the issue of indemnification will be DENIED. Because the only remaining issue is that of indemnification, this action should be stayed pending the conclusion of the claimant's underlying action against the insured.

## IV.

## CONCLUSION & RULING

Under the insurance policy and upon reviewing the allegations in the underlying

state court petition against the insured, the Court concludes that the insurer's duty to defend has been triggered. The Court will not consider any extrinsic evidence submitted by the parties in this case. Whether by way of oral testimony or stipulations of fact, the Court is not permitted to review extrinsic evidence outside the policy and the state court petition. This is especially so because the evidence submitted does not go to "fundamental coverage" issues that can be determined by "readily determined facts," such as the existence of the policy or whether the Defendants in the state court action are named insureds under this policy. Consequently, the Court observes that no allegation in the petition admits of any facts that require the operation of Exclusion B; therefore, for the purposes of the duty to defend, coverage cannot be disproved, and the presumptions of coverage remain.

The Court declines to reach the insurer's ultimate duty to indemnify. The Court believes that state law, which generally must be applied in diversity actions, prohibits a determination at this time as to whether the insurer must bear this duty. Alternatively, even if the Court were authorized to address the insurer's duty to indemnify now, several considerations, as noted in this opinion, weigh against reaching that issue. Therefore, as an alternate basis for declining to decide this issue, the Court exercises its discretion to deny the parties declaratory relief on indemnification. Accordingly, it is

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 33) is **GRANTED IN PART** and **DENIED in PART**. Furthermore, it is

**ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. No. 34) is **DENIED**. Additionally, it is

**ORDERED** that Plaintiff's Motion to Strike the Affidavit of Don Morris (Dkt.

No. 40) is **DENIED AS MOOT** because the Court does not rely on any extrinsic evidence offered by the parties in making this ruling. Lastly, the Court directs the parties to file any Rule 54(b) motion, if at all, within 30 days of the issuance of this Order. Lastly, it is

**ORDERED** that this action is stayed, pending the adjudication of the claimant's claims against the insured in the underlying state court case.

**SO ORDERED.**